IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

APR - 7 2025

RICK WARREN
COURT CLERK
125 _____

DANIELLE ROSS, individually, and as next of kin to MARQUIEL D. ROSS, deceased, and ESTATE OF MARQUIEL D. ROSS, ex rel. RACHEL MACON, as Administrator,
    Plaintiff,

vs.

STEVEN HARPE, in his individual and official capacities as Director of the Oklahoma Department of Corrections; CHRISTE QUICK, in her individual and official capacities as Warden of the Oklahoma State Penitentiary; KELLI DAVIS, in her individual and official capacities as Warden of the Jess Dunn Correctional Center; JOHN AND JANE DOES 2-10, in their individual and official capacities; and THE OKLAHOMA DEPARTMENT OF CORRECTIONS,
    Defendants.

CJ-2025-2343

Case No.: CIV-_____

JURY TRIAL DEMANDED

## PETITION

**NOW INTO COURT COMES** Plaintiffs, Estate of Marquiel D. Ross (hereinafter "Estate Plaintiff"), by and through its Administrator, Rachel Macon, and Danielle Ross, individually as the mother and next of kin of Marquiel D. Ross (hereinafter "Individual Plaintiff"), and for their causes of action against the Defendants, allege and state as follows:

### PARTIES

1. Decedent Marquiel D. Ross was a resident of Tulsa, Oklahoma, at the time of his incarceration and subsequent death on September 12, 2024, while in the custody of the Oklahoma Department of Corrections ("ODOC").

2. Plaintiff Danielle Ross, the mother of Marquiel D. Ross, is a resident of Tulsa, Oklahoma. Danielle Ross brings this action individually to recover for the profound emotional harm, loss of

**Exhibit 2**

companionship, support, and consortium she has suffered due to the wrongful death of her son while in the custody of the Oklahoma Department of Corrections.

3. Plaintiff Rachel Macon, who has a pending probate matter to be designated as the Personal Representative of the Estate, resides in Tulsa County, Oklahoma.

4. Defendant Steven Harpe is the Director of ODOC and is sued in his individual and official capacities. Upon information and belief, Harpe resides in Oklahoma and may be served at ODOC headquarters in Oklahoma County.

5. Defendant Christe Quick is the Warden of the Oklahoma State Penitentiary and is sued in her individual and official capacities. Upon information and belief, Quick resides in McAlester, Oklahoma and may be served at the Oklahoma State Penitentiary, 1301 North West Street, McAlester, OK 74502.

6. Defendant John Doe is the Warden of the Jess Dunn Correctional Center and is sued in her individual and official capacities.

7. Defendants John and Jane Does 2-10 are unknown ODOC administrators, correctional officers, nurses, and staff employed by ODOC who are sued in their individual and official capacities.

8. Defendant Oklahoma Department of Corrections is the state agency responsible for the custody and care of individuals incarcerated in its facilities, including Marquiel D. Ross.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this action pursuant to Article VII, Section 7 of the Oklahoma Constitution.

10. Venue is proper in Oklahoma County, Oklahoma, as the headquarters of ODOC and the official acts and omissions complained of occurred in Oklahoma County.

**GENERAL FACTUAL ALLEGATIONS**

**Exhibit 2**

11. Marquiel Dae'juan Ross, a 24-year-old nonviolent offender, was incarcerated in ODOC's custody and died under suspicious and violent circumstances on September 12, 2024.

12. Mr. Ross was serving a two-year sentence for being an accessory to carjacking, stemming from an incident in which he unknowingly accepted a ride in a stolen vehicle.

13. As a first-time offender, Mr. Ross first received a suspended sentence. However, due to financial hardship, he was unable to pay $1,300 in probation fees. It was principally his inability to pay the probation fee that resulted in the revocation of his deferred sentence, leading to his incarceration for a two-year term.

14. Despite his nonviolent offense and lack of prior criminal history, Mr. Ross got transferred from the minimum-security Jackie Brannon Correctional Center to the maximum-security Oklahoma State Penitentiary ("OSP") in McAlester, Oklahoma, without justification.

15. On information and belief, at OSP, Mr. Ross was brutally beaten and strangled to death in his cell by his cellmate, Justin Harris, a known violent offender with a documented history of dangerous behavior.

16. Despite his very diminutive stature (5'4", 135 pounds) and a nonviolent criminal record, Mr. Ross was placed in a high-security unit with individuals known for violent tendencies, including Harris, who has since been charged with Ross's murder.

17. On September 12, 2024, Mr. Ross's lifeless body was discovered in his cell, showing signs of severe trauma, including extensive bruising and strangulation marks.

18. ODOC staff documented that Mr. Ross was stiff and cold to the touch upon discovery, which is consistent with rigor mortis, a condition that typically begins to set in approximately two to four hours after death and becomes fully established within six to twelve hours.

**Exhibit 2**

19. During the many hours following Mr. Ross's death and preceding the discovery of Mr. Ross's body, ODOC staff failed to perform required security checks or otherwise intervene, despite clear evidence of a violent assault.

20. A female corrections officer walked past Mr. Ross's cell during count and was informed by his cellmate, Justin Harris, that Mr. Ross was dead. Instead of investigating or summoning help, the officer completed her count and returned to the control room.

21. After the passage of some time, the same officer casually mentioned to colleagues that Mr. Harris claimed his cellmate was dead. Another officer eventually responded, finding Mr. Ross deceased.

22. ODOC staff moved Mr. Ross's body within 15 minutes of its discovery, violating standard protocols for preserving a crime scene and compromising the integrity of any investigation.

23. According to Section I of ODOC's "Inmate Death, Injury & Illness Notification and Procedures" (OP-140111), in cases of suspicious or unexpected death, or apparent homicide, the death scene should not be disturbed beyond what is necessary to perform resuscitation efforts or to establish that death has occurred. A body is not to be removed until authorized by an agent or designee of the Office of Inspector General ("OIG"). ODOC's actions in this case contravened these requirements blatantly, as staff prematurely moved the body before obtaining authorization.

24. The actions and omissions of ODOC and its staff reflect deliberate indifference to Mr. Ross's health and safety, let alone to his human rights and dignity.

25. Defendants knew or should have known that housing Mr. Ross with Justin Harris posed a significant danger to his safety, yet they failed to act on this knowledge and disregarded Mr. Ross's repeated requests for protection.

**Exhibit 2**

26. Section IV.A. of OP-140111, "Inmate Death, Injury, and Illness Notification and Procedures", mandates that upon an inmate's death, the designated emergency contact must be notified as soon as possible using telephone or another rapid form of communication.

27. ODOC records indicate that on September 13, 2024, ODOC notified the family that Mr. Ross had been transferred to a high-security unit, even though he died on September 12, 2024.

28. The family of Mr. Ross, including Plaintiffs, later learned from other inmates in the jail that Mr. Ross had died due to strangulation and blunt force trauma sustained in his cell.

29. The family was not informed of Mr. Ross's death by ODOC until a week later, on September 19, 2024, despite ODOC's policy requiring immediate notification of next of kin.

30. The prolonged delay in notifying Mr. Ross's family is a clear violation of this policy.

31. During that time, ODOC authorized the cremation of Mr. Ross's body without consulting his family, further raising suspicions about their handling of the case.

32. Upon viewing Mr. Ross's body at the funeral home, family members observed extensive injuries inconsistent with ODOC's initial account of his death.

33. The autopsy performed on Mr. Ross's body revealed multiple injuries consistent with severe assault.

34. ODOC initially claimed that Mr. Ross died on September 17, 2024, despite the medical examiner's report clearly stating his death occurred on September 12, 2024.

35. ODOC has changed Mr. Ross's release date in its system multiple times, including at least twice ***showing his discharge date as supposed to have taken place many months before his death!*** Finally, after several revisions which it made even after his death, ODOC finally came to show Mr. Ross's discharge date as September 12, 2024 – the day he was murdered.

36. Mr. Ross had been held in ODOC custody for nearly a year beyond his original discharge date of November 19, 2023, without justification or due process.

**Exhibit 2**

37. Family members made repeated inquiries to ODOC about Mr. Ross's status in the months leading up to his death but were met with evasive responses and false information.

38. In July 2024, ODOC informed the family that Mr. Ross's release was delayed due to incomplete paperwork, even though his discharge date had already passed.

39. On July 24, 2024, the family discovered through ODOC's online system that Mr. Ross remained in custody without any explanation for the delay in his release.

40. By August 2024, ODOC provided conflicting information, at times stating that Mr. Ross was set to be released, while at other times claiming procedural issues, such as the lack of a verifiable address, prevented his discharge.

41. ODOC staff failed to provide any documentation or credible explanation for the transfer of Mr. Ross to OSP.

42. After Mr. Ross's death, ODOC provided inconsistent accounts of the events leading up to his murder, including false claims about the timeline and their attempts to notify the family.

43. On information and belief, ODOC staff mishandled or falsified records related to Mr. Ross's incarceration, transfer, and death to conceal their negligence.

44. The decision to house Mr. Ross with Justin Harris, a well-known violent offender with a history of battery of his cellmates, violated established protocols and amounted to deliberate indifference to Mr. Ross's safety.

45. Mr. Ross's death is part of a broader pattern of neglect and abuse within ODOC facilities, where vulnerable inmates are routinely placed in unsafe conditions.

## CLAIMS FOR RELIEF

### First Cause of Action: 42 U.S.C. § 1983 Violation
### Against Defendants in Their Individual and Official Capacities

46. Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

Exhibit 2

47. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

48. Defendants, acting under color of state law, violated Mr. Ross's Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process. The deliberate indifference standard under the Eighth Amendment requires showing that the Defendants knew of and disregarded an excessive risk to Mr. Ross's safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The Fourteenth Amendment prohibits the deprivation of liberty without due process of law.

49. Defendants acted with deliberate indifference by transferring Mr. Ross, a small-statured, nonviolent offender, to a high-security unit known for housing violent inmates, without any legitimate justification or consideration of his safety.

50. Defendants further demonstrated deliberate indifference by failing to act on knowledge of threats to Mr. Ross's safety, ignoring his requests for protection, and failing to perform adequate security checks.

As a direct and proximate result of Defendants' actions and omissions, Mr. Ross suffered severe physical and emotional harm, culminating in his death. The policies, practices, and customs of ODOC and its officials created an environment where such constitutional violations were likely to occur and were, in fact, tacitly approved.

### Second Cause of Action: Supervisory Liability Under 42 U.S.C. § 1983
### Against Defendants in Supervisory Roles

51. Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

**Exhibit 2**

52. Defendants in supervisory positions were personally involved in, or aware of, the violations of Mr. Ross's constitutional rights. They promulgated or failed to correct policies, practices, and customs that led to these violations, including improper inmate placements, inadequate security checks, and disregard for due process.

53. Supervisory Defendants were aware of systemic deficiencies, including staff failures to follow safety protocols and deliberate indifference to inmate welfare. Despite this knowledge, they failed to take corrective action, which directly contributed to Mr. Ross's injuries and death.

54. Supervisory Defendants failed to provide adequate training and oversight to ensure compliance with constitutional standards, demonstrating deliberate indifference to the rights of inmates like Mr. Ross. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

55. As a direct and proximate result of Supervisory Defendants' acts and omissions, Mr. Ross endured unconstitutional conditions of confinement, was subjected to violence, and ultimately lost his life.

### Third Cause of Action: *Canton* Liability Under 42 U.S.C. § 1983 (Failure to Train) Against Defendants in Their Individual and Official Capacities

56. Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

57. Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), and *City of Canton v. Harris*, 489 U.S. 378, 390 (1989), a municipality or agency may be held liable for constitutional violations caused by its policies, practices, or customs, including its failure to adequately train or supervise employees where such failure amounts to deliberate indifference to the rights of individuals.

The ODOC and its officials failed to train and supervise correctional staff adequately, resulting in systemic deficiencies that proximately caused the injuries and death of Mr. Ross. These failures include, but are not limited to:

- 8 -

**Exhibit 2**

(a) A lack of training on the proper classification and housing of vulnerable, nonviolent offenders, leading to the placement of Mr. Ross in a high-security unit with violent inmates;

(b) Inadequate training on identifying and addressing credible threats to inmate safety, including responding to reports of danger or requests for protection;

(c) Failure to train staff on adherence to established safety protocols, including conducting timely and effective security checks;

(d) A lack of training and supervision on compliance with constitutional obligations regarding the preservation of crime scenes and the prompt notification of next of kin; and

(e) A failure to develop and implement policies to address the risks associated with delayed or falsified release dates.

58. The Defendants knew or should have known that these training and supervisory deficiencies posed a substantial risk of harm to inmates like Mr. Ross. The risks were so obvious that the failure to address them reflects deliberate indifference to inmates' constitutional rights. Prior incidents and patterns of harm at ODOC facilities demonstrate that the need for improved training and supervision was clear, and the failure to act on this knowledge directly contributed to Mr. Ross's injuries and death.

59. As a direct and proximate result of these failures, Mr. Ross suffered physical harm, emotional anguish, and death. His family was further deprived of timely information, closure, and due process.

60. Plaintiffs seek compensatory damages for the injuries suffered by Mr. Ross and his family, as well as punitive damages to deter similar constitutional violations in the future.

**Fourth Cause of Action: Violation of Due Process Rights**
**(Under the Fourteenth Amendment – Unlawful Prolonged Incarceration)**
**Against Defendants in Their Individual and Official Capacities**

61. Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

62. Defendants held Mr. Ross beyond his legal release date, depriving him of his liberty without due process of law, in violation of the Fourteenth Amendment.

**Exhibit 2**

63. By holding Mr. Ross beyond his legal release date, Defendants deprived him of liberty without due process, violating the Fourteenth Amendment. Under *Zinermon v. Burch*, 494 U.S. 113, 125 (1990), procedural due process requires meaningful opportunity to be heard before liberty is curtailed.

64. Defendants failed to provide Mr. Ross with any such opportunity before unlawfully extending his incarceration. *Id.*

65. Defendants' actions directly contributed to Mr. Ross's placement in dangerous conditions, ultimately resulting in his death.

66. As a result of this violation, Mr. Ross and his family suffered significant harm, including physical injuries, emotional trauma, and loss of life and companionship.

### Fifth Cause of Action: Cruel and Unusual Punishment (42 U.S.C. § 1983)
### (Eighth and Fourteenth Amendments)
### Against Defendants in Their Individual and Official Capacities

67. Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

68. Defendants Harpe, Quick, Doe, and Does 2-10, acting under color of state law, deprived Mr. Ross of his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment and to receive adequate protection while incarcerated.

69. Defendants were deliberately indifferent to Mr. Ross's safety by failing to:

   (a) Properly classify inmates and separate Mr. Ross from violent offenders;

   (b) Respond to Mr. Ross's requests for protection;

   (c) Adequately train and supervise correctional staff.

70. Defendants knowingly exposed Mr. Ross to an unreasonable risk of harm, ignoring credible threats to his safety and failing to intervene despite clear evidence of impending danger.

Exhibit 2

71. As a direct and proximate result of Defendants' actions and omissions, Mr. Ross suffered severe physical and emotional injuries, culminating in his death.

72. Plaintiffs seek compensatory and punitive damages against Defendants in their individual capacities and declaratory relief against Defendants in their official capacities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against all Defendants, jointly and severally, and grant the following relief:

1. Compensatory Damages for the Estate of Marquiel D. Ross:

    (a) Recovery of all medical and burial expenses incurred as a direct result of Mr. Ross's death, pursuant to 12 O.S. § 1053(B)(1).
    (b) Compensation for pre-death physical pain and mental anguish suffered by Mr. Ross as a result of Defendants' actions, pursuant to 12 O.S. § 1053(B)(3).
    (c) Damages for the loss of Mr. Ross's future earnings and financial contributions, calculated based on his age, occupation, earning capacity, and probable life expectancy, as provided under 12 O.S. § 1053(B)(4).

2. Compensatory Damages for Danielle Ross:

    (a) Damages for grief and loss of companionship due to the wrongful death of her son, as provided under 12 O.S. § 1053(B)(5).
    (b) Damages for emotional distress caused by Defendants' extreme and outrageous conduct, including their delay in notifying her of her son's death, their misleading information, and their attempt to cremate his body without her consent, under IIED and NIED claims.

3. Award punitive damages under 23 O.S. § 9.1 and applicable federal standards for Defendants' deliberate indifference, reckless misconduct, and attempts to conceal their wrongdoing, to deter such conduct in the future.

4. Monetary damages for claims under Oklahoma law, including but not limited to negligence and wrongful death.

5. Issue a declaratory judgment that Defendants' acts, omissions, policies, and practices:

    (a) Violated Mr. Ross's constitutional rights under the Eighth and Fourteenth Amendments.
    (b) Breached their legal duties under state law, resulting in Mr. Ross's wrongful death.

6. Grant injunctive relief requiring the Oklahoma Department of Corrections to:

**Exhibit 2**

(a) Revise its policies to ensure the safety and protection of vulnerable inmates.
(b) Implement proper training and supervision of staff to prevent future violations of constitutional and statutory rights.
(c) Comply with protocols for notifying next of kin and preserving crime scenes in cases of inmate death.

7. Award reasonable attorneys' fees, costs, and litigation expenses under 42 U.S.C. § 1988 and other applicable state and federal laws.

8. Award pre- and post-judgment interest on all monetary damages awarded to Plaintiffs to account for the time elapsed between the wrongful acts and final payment.

9. Grant any other relief deemed just and proper under the circumstances to ensure full and fair compensation for Plaintiffs and to hold Defendants accountable.

Dated: April 7, 2025.
Respectfully submitted,

*/s/ Richard C. Labarthe/*

Richard C. Labarthe, OBA # 11393

*/s/ Alexey Tarasov/*

Alexey V. Tarasov, OBA # 32926
LABARTHE & TARASOV, a professional association
1000 W. Wilshire Blvd., Suite 355
Oklahoma City, Oklahoma 73116
(405) 760-3323; (405) 843-9685 Facsimile
richard@labarthelaw.com
330 W. Gray Street, Suite 208
Norman, OK 73069
(405) 410-5631; (832) 558-3540 Facsimile
alexey@tarasovlaw.com
**Attorneys for Plaintiffs**

**Exhibit 2**