**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OKLAHOMA**

| | | |
|---|---|---|
| DANIELLE ROSS, individually and as next of kin to MARQUIEL D. ROSS, deceased; and ESTATE OF MARQUIEL D. ROSS, ex rel., RACHEL MACON, as Administrator, Plaintiffs, v. STEVEN HARPE, individually; CHRISTE QUICK, individually; KAMERON HARVANEK, individually; BRITTANY CHASTANG, individually; CSO IV HAYES, individually; CSO IV KILLION, individually; CSM I MOONEY, individually; AGENT TOMMY STRANAHAN, individually; CHSA KIMBERLY HALL, individually; LPN ASHLEY BILLS, individually; CSO IV JUSTIN JORDAN, individually; CSO III DUSTIN HENRY, individually; CSM I DUSTIN WILLBANKS, individually; DEPUTY WARDEN NANCI BATTLES, individually; and JOHN AND JANE DOES 1-10, individually, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: 25-cv-472-J JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

**NOW INTO COURT COME** Plaintiffs, Estate of Marquiel D. Ross (hereinafter "Estate" or "Estate Plaintiff"), by and through its Administrator, Rachel Macon, and Danielle Ross, individually as the mother and next of kin of Marquiel D. Ross (hereinafter "Individual Plaintiff"), and for their causes of action against the Defendants, allege and state as follows:

### PARTIES

1.    Decedent Marquiel D. Ross ("Ross" or "Mr. Ross") was a resident of Tulsa, Oklahoma, at the time of his incarceration and subsequent death on September 12, 2024, while in the custody of the Oklahoma Department of Corrections ("ODOC").

2.    Plaintiff Danielle Ross, the mother of Marquiel D. Ross, is a resident of Tulsa, Oklahoma. Danielle Ross brings this action individually to recover for the profound emotional harm, loss of

companionship, support, and consortium she has suffered due to the wrongful death of her son while in ODOC custody.

3.    Plaintiff Rachel Macon, the duly appointed Administrator of the Estate, resides in Tulsa County, Oklahoma.

4.    Defendant Steven Harpe is the Director of ODOC and is sued in his individual capacity. Upon information and belief, Harpe resides in Oklahoma and may be served at ODOC headquarters in Oklahoma County.

5.    Defendant Christe Quick is the Warden of the Oklahoma State Penitentiary and is sued in her individual capacity. Upon information and belief, Quick resides in McAlester, Oklahoma and may be served at the Oklahoma State Penitentiary, 1301 N. West Street, McAlester, OK 74502.

6.    Defendant Kameron Harvanek is the Warden of the Howard McLeod Correctional Center ("HMCC") and is sued in his individual capacity.

7.    CSO IV Brittany Chastang, CSO IV Hayes, CSO IV Killion, CSM I Mooney, Agent Tommy Stranahan, CHSA Kimberly Hall, LPN Ashley Bills, CSO IV Justin Jordan, CSO III Dustin Henry, CSM I Dustin Willbanks, and Deputy Warden Nanci Battles (collectively, "CSO Employees") are correctional staff employed by ODOC and sued in their individual capacities.

8.    Defendants John and Jane Does 1-10 (collectively, the "Does") are unknown ODOC administrators, correctional officers, nurses, and staff employed by ODOC who are sued in their individual capacities.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to Article VII, Section 7 of the Oklahoma Constitution.

10.    Venue was originally proper in Oklahoma County, Oklahoma, as the headquarters of ODOC and the acts/omissions complained of occurred in Oklahoma County. However, this action has since been removed to this federal court.

## GENERAL FACTUAL ALLEGATIONS

11.    Marquiel Dae'juan Ross, a diminutive (5'5" by 130 pound) 24-year-old nonviolent offender, was incarcerated in ODOC's custody and died under suspicious and violent circumstances on September 12, 2024.

12.    Ross was serving a two-year sentence for being an accessory to carjacking, stemming from an incident in which he unknowingly accepted a ride in a stolen vehicle.

13.    As a first-time offender, Mr. Ross's public defender was happy to secure a 2-year deferred sentence. However, due to financial hardship, Ross could not pay the required $1,366 in probation fees. Shockingly, it was principally Ross's inability to pay this probation fee that prompted the Tulsa County DA's office to apply to accelerate his deferred sentence, leading to his incarceration for a two-year term.

14.    In or around November 2023, Mr. Ross was being transported from HMCC in ODOC's Atoka facility, to the Lexington Assessment and Reception Center ("LARC") operated by ODOC in Lexington, Oklahoma. However, at some point at or shortly following the commencement of Ross's transport to LARC, one or more of the Does inexplicably decided instead to transfer Ross from the lowest security level, not to LARC, but directly to the maximum-security Oklahoma State Penitentiary (herein, "OSP," colloquially called "Big Mac") in McAlester, known for housing Oklahoma's most violent and dangerous inmates.

15.    On information and belief, this sudden decision (to move Ross to Big Mac rather than LARC) was made by one or more of the Does as a retaliatory measure to punish Ross for unknown personal animus or to "teach him a lesson." The culture that allows for these rogue punishments is well known to, and tacitly, if not expressly, approved by executives at the highest level of ODOC, including, without limitation, by defendants Harpe and one or more of the Does.

16.    At OSP, Ross, was initially placed in a single cell until, without warning or explanation, late on September 11, 2024 (the eve of his death), officials at OSP, again for unknown reasons

- 3 -

but, on information and belief, believed to be for yet unknown personal animus, placed Mr. Ross in a two-man cell with a 250 pound inmate named Justin Harris, a known violent offender with a documented history of dangerous behavior, including battery of previous cellmates.

17.    Apart from the offense he pled to, which resulted in the accelerated two-year deferred sentence, young Mr. Ross had no prior criminal record of any kind, juvenile or adult, violent or nonviolent. Nevertheless, Mr. Ross was placed in a high-security housing unit with individuals known for violent tendencies, including Harris, Ross's cellmate for the brief final hours of his life and who has since been charged with Ross's murder. Ross did not come close to surviving 24 hours after being placed in the cell with Harris.

18.    On September 12, 2024, at approximately 2:08 p.m., correctional officer Brittany Chastang ("CSO IV Chastang") discovered Mr. Ross's lifeless body in his cell, but she did not stop to investigate sometime earlier despite Harris's having then told her, "[h]ey, I think 'my cellie' is dead." Whether CSO IV Chastang's failure to immediately stop her "count" and properly prioritize and investigate Harris's statement was due to negligent training and supervision or due to some animus toward Ross, she did not stop to investigate the possible cell death (or, if not a death, a probable severely injured inmate) but rather, she instead went to the CSO Employees' Break Room.

19.    On information and belief, only after CSO IV Chastang had settled into the break room did she mention Harris's comment to other corrections officers, including CSO IV Hayes, and CSO IV Killion, all of whom then joined CSO IV Chastang in going to the subject cell whereupon they observed that Ross's body was stiff and cold, consistent with rigormortis, which confirms that ODOC staff had previously, for several hours, failed to properly conduct required security checks (*i.e.*, "Counts") before finally discovering Ross's body.

20.    Despite clear signs of a violent assault and death scene, staff improperly disturbed the scene. At approximately 2:30 p.m., CSM I Mooney secured the cell door with crime scene logs only after significant scene disturbance.

21.    At approximately 2:35 p.m., Agent Tommy Stranahan was notified, and ODOC medical examiner CHSA Kimberly Hall attempted contact with next of kin, reflecting delayed notification and response.

22.    Staff moved Mr. Ross's body within approximately 15 minutes of discovery, directly violating Section I of ODOC policy OP-140111, which mandates the preservation of inmate death scenes until authorized by the Office of Inspector General (OIG).

23.    ODOC staff's actions demonstrated deliberate indifference to Mr. Ross's health and safety.

24.    Defendants Harpe, Quick, and Kameron Harvanek knew or should have known about the significant risks of housing a diminutive, non-violent, first-offender inmate like Ross with a hulking, known-violent inmate like Harris, yet disregarded Ross's requests for protection and safety concerns.

25.    Section IV.A. of ODOC's OP-140111 mandates immediate notification of designated emergency contacts upon inmate death, a requirement ODOC violated.

26.    ODOC falsely informed Ross's family on September 13, 2024, that he had merely been "transferred to a high-security unit," despite knowing that Ross was already deceased.

27.    Ross's family learned of his violent death, not from ODOC, but from other inmates. For reasons unknown, ODOC delayed official notification to the family until September 19, 2024, a full week after his death, violating the policy requiring immediate family notification.

28.    Before ODOC had even bothered to notify the family, ODOC had already authorized the cremation of Ross's body.

29.    Family members observed several grotesque and severe injuries to Ross's body at the funeral home, contradicting ODOC's initial account.

30.    Autopsy results revealed multiple blunt force trauma injuries indicative of a severe assault. In short, Ross's injuries indicate that he was beaten to death.

31.    Again, for reasons unknown, ODOC falsely claimed Ross died on September 17, 2024, despite official medical records confirming the actual date as September 12, 2024.

32.    ODOC repeatedly altered Ross's scheduled release date in its system, including even after his death, ultimately settling on a discharge date of the day he was murdered, September 12, 2024. At various times, ODOC had scheduled Ross's release date to occur as early as November 19, 2023, and that scheduled discharge date was later replaced by a date of July 8, 2024.  ODOC continued to show 7/8/24 as Ross's scheduled discharge date on its "Offender Lookup" system until after his death.

33.    ODOC, unlawfully and without explanation, detained Ross far beyond ODOC's official discharge date of 11/19/23, and even their next published discharge of 7/8/24 without any legal justification or due process.

34.    Family members made repeated inquiries to ODOC about Mr. Ross's status in the months leading up to his death but were met with evasive responses and false information.

35.    On 7/24/24, the family discovered, through ODOC's online system, that Ross remained in custody without any explanation for the delay in his release. In response to the family's feverish efforts to find out why Ross was being kept in prison after his published release date, officials at ODOC informed the family that Mr. Ross's release was delayed due to "incomplete paperwork," even though his 7/8/24 discharge date had by then already come and gone for over two weeks.

36.    By August 2024, ODOC provided conflicting information, at times stating that Mr. Ross was set to be released, while at other times claiming putative procedural issues, such as lack of a verifiable address, prevented his discharge.

37.    ODOC staff failed to provide any documentation or credible explanation for the transfer of Ross to OSP.

38.    Following Ross's death, ODOC offered inconsistent and deceptive accounts about the timeline of events and the notification process.

39.    ODOC staff falsified or mishandled records related to Ross's incarceration, transfer, and death to conceal negligence and violations.

40.    Ross's wrongful placement with Harris directly resulted from ODOC's deliberate indifference and violation of inmate classification and safety protocols.

41.    Correctional officers involved, including Brittany Chastang, CSO IV Hayes, CSO IV Killion, LPN Ashley Bills, CSO IV Justin Jordan, CSO III Dustin Henry, CSM I Dustin Willbanks, and Deputy Warden Nanci Battles demonstrated failures in adhering to policies and protocols in response to the discovery and handling of Ross's death.

42.    Ross's death reflects systemic issues of inmate neglect, abuse, and unsafe housing practices within ODOC facilities.

43.    Plaintiffs do not assert any claims for monetary relief against the Oklahoma Department of Corrections, or against any Defendant in his or her official capacity.

44.    All of the following individual capacity allegations against Defendants Steven Harpe, Christe Quick, Nanci Battles and Kameron Harvanek are made on information and belief.

**Individual Capacity Allegations for Defendant Steven Harpe (ODOC Director):**

45.    Defendant Harpe, as Director of ODOC, acted under color of state law and held ultimate responsibility for ensuring appropriate staffing, security protocols, and inmate safety across all ODOC facilities.

46.    Defendant Harpe has at all material times direct knowledge from internal ODOC reports, audits, staffing assessments, and widespread media coverage that significant understaffing was and is prevalent throughout ODOC facilities, notably at OSP, leading to increased inmate violence, assaults, and fatalities.

47.    Defendant Harpe specifically knew that understaffing directly contributes to increased incidents of inmate murders at ODOC facilities, as evidenced by his explicit requests to the Oklahoma legislature for appropriations in Fiscal Year 2024, seeking funding for significantly more correctional staff than were actually employed at the time. These staffing deficiencies and associated risks were openly addressed and recognized during legislative hearings prior to Mr. Ross's death on September 12, 2024.

48.    Despite this awareness, Defendant Harpe failed to adequately address staffing shortages or to implement remedial measures, knowingly perpetuating conditions that significantly endangered inmates, including Marquiel Ross.

49.    Defendant Harpe's deliberate failure to rectify these documented issues was directly responsible for the unsafe conditions at OSP that culminated in Ross's violent death, constituting supervisory liability through his exercise of control and deliberate indifference to inmate safety.

**Individual Capacity Allegations for Defendants Christe Quick and Nanci Battles (Warden and Deputy Warden of OSP):**

50.    Defendants Quick and Battles, as Warden and Deputy Warden of OSP respectively, acted under color of state law and maintained and endorsed a longstanding practice within their facility of intentionally housing inmates who filed complaints or were deemed problematic with known violent offenders as a punitive measure.

51.    Defendants Quick and Battles possessed direct knowledge of prior incidents where such placements resulted in significant inmate injury and death, clearly demonstrating the high risk associated with this policy.

52.    Despite knowing Ross's nonviolent record, small physical stature, and recent transfer from a minimum-security facility, Defendants Quick and Battles allowed Mr. Ross's placement in a cell with inmate Justin Harris, an enormous inmate known for having a violent history toward other inmates, and particularly as to his prior cellmates.

53.    Defendants Quick and Battles were directly informed, either personally or via senior staff, about Ross's repeated requests for protection from threats of violence yet deliberately refused or failed to take protective measures, demonstrating clear deliberate indifference to his safety.

54.    Defendants Quick's and Battles' failure to adequately train and supervise OSP staff in proper inmate classification and safety protocols directly resulted in the unconstitutional and dangerous placement decisions that led to Mr. Ross's death.

**Individual Capacity Allegations for Defendant Kameron Harvanek (Warden of HMCC):**

55.    Defendant Kameron Harvanek, as Warden of HMCC, acted under color of state law and was directly aware of and participated in or acquiesced to a known abusive practice at HMCC of transferring inmates who lodged complaints or grievances, or who were otherwise viewed as troublesome, to higher-security facilities, specifically OSP, without legitimate justification.

56.    Defendant Harvanek was aware, through inmate complaints, grievances, and prior administrative incidents, of the systemic retaliation practice involving transfers of nonviolent inmates from minimum-security conditions to maximum-security conditions at OSP.

57.    Defendant Harvanek directly authorized, facilitated, or consciously failed to prevent the transfer of Marquiel Ross from the lowest security-level facility at HMCC to OSP, solely as retaliatory punishment, knowingly exposing him to an unjustifiable risk of severe harm or death.

58.    The deliberate decision by Defendant Harvanek to transfer Mr. Ross to OSP without penological justification directly resulted in Ross's placement with violent inmate Justin Harris and ultimately resulted in Ross's violent death.

59.    Defendant Harvanek's failure to adequately train and supervise HMCC staff regarding proper transfer procedures, inmate safety concerns, and appropriate responses to inmate grievances and complaints was directly responsible for the unconstitutional retaliatory transfer and resulting harm to Mr. Ross, establishing supervisory and training liability.

## CLAIMS FOR RELIEF

### First Cause of Action: 42 U.S.C. § 1983 Violation
### Against Defendants in Their Individual Capacities

60.  Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

61.  All claims for monetary relief in this Cause of Action are asserted against the above-named defendants solely in their individual capacities.

62.  42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."

63.  Defendants Steven Harpe, Christe Quick, Kameron Harvanek, Brittany Chastang, CSO IV Hayes, CSO IV Killion, CSM I Mooney, Agent Tommy Stranahan, CHSA Kimberly Hall, LPN Ashley Bills, CSO IV Justin Jordan, CSO III Dustin Henry, CSM I Dustin Willbanks, and Deputy Warden Nanci Battles, as well as the John and Jane Doe Defendants, acting under color of state law, violated Mr. Ross's constitutional rights under the Eighth and Fourteenth Amendments by exhibiting deliberate indifference to Ross's health, safety, and due process rights.

64.  Defendant Harpe knowingly failed to correct critical understaffing across ODOC facilities despite clear and direct knowledge, derived from internal assessments, legislative hearings, and his own public admissions, that such understaffing created a substantial and foreseeable risk of inmate assaults and deaths, including the circumstances resulting in Mr. Ross's murder.

65.  Defendants Quick and Battles intentionally authorized or permitted the placement of Mr. Ross, a very small and vulnerable young, nonviolent inmate, into a cell with a behemoth of an inmate in Justin Harris, despite direct knowledge of Harris's violent history and previous

incidents of violence against other inmates, and despite direct or constructive notice of Mr. Ross's explicit requests for protective intervention.

66.    Defendant Harvanek intentionally or recklessly authorized the transfer of Mr. Ross from HMCC, a minimum-security facility, to the OSP maximum-security facility without penological justification, in retaliation for inmate complaints or grievances, knowing that such punitive transfers created a high risk of inmate harm or death.

67.    Defendants Quick, Battles, Chastang, Hayes, Killion, Mooney, Stranahan, Hall, Ashley, Jordan, Henry and Willbanks failed to adhere to established safety, monitoring, reporting, investigative, and notification protocols following Ross's assault and death, including neglecting mandated security checks, disturbing critical crime scene evidence, delaying emergency response and family notification, and falsely reporting and handling the circumstances of Ross's death.

68.    Each Defendant's deliberate indifference, individually and collectively, created conditions which deprived Ross of his constitutional right to protection from cruel and unusual punishment under the Eighth Amendment and his right to due process under the Fourteenth Amendment.

69.    These Defendants' actions and omissions directly and proximately caused severe physical and emotional injuries to Mr. Ross, ultimately resulting in his death.

70.    Such unconstitutional actions reflect systemic deficiencies and established customs and practices within ODOC, demonstrating tacit approval and deliberate indifference by the individually named officials to inmate safety and constitutional rights.

### Second Cause of Action: Supervisory Liability Under 42 U.S.C. § 1983 Against Defendants in Supervisory Roles

71.    Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

72.    This claim is asserted solely against the above-named defendants in their individual capacities.

73.    Defendants Harpe, Quick, Battles and Harvanek, each in their roles as supervisors but sued here in their individual capacities, as well as the John and Jane Doe Defendants, acted under color of state law. Each Defendant maintained ultimate supervisory responsibility for operations, policies, staffing, training, inmate classification, security protocols, and overall conditions within their respective facilities.

74.    Defendant Harpe had actual notice from internal audits, staffing assessments, legislative testimony, and media coverage of chronic understaffing and resulting increase in inmate-on-inmate violence, yet failed to take reasonable steps to correct these well-documented deficiencies.

75.    By failing to adequately staff ODOC facilities despite explicit acknowledgment of dangerous staffing shortfalls, Defendant Harpe created, maintained, and permitted conditions that predictably endangered inmate safety, resulting in a heightened risk of violence culminating in Mr. Ross's death.

76.    Defendants Quick and Battles had actual knowledge of and permitted an established custom at OSP of housing vulnerable or complaining inmates with inmates known for violent behavior as punishment or to deter inmates from making any further complaints or requests for safer housing assignments.

77.    Despite clear knowledge of previous violent outcomes from this improper housing practice, Defendants Quick and Battles failed to correct this dangerous custom, directly authorizing or knowingly allowing Mr. Ross's dangerous placement with Justin Harris, resulting in predictable and ultimately fatal consequences.

78.    Defendant Harvanek directly oversaw and was aware of a retaliatory practice within HMCC of transferring inmates who submitted complaints or grievances from minimum-security facilities to high-security facilities, such as OSP, without legitimate penological justification.

79.    Despite specific prior incidents and grievances highlighting the severe risks associated with such retaliatory transfers, Defendant Harvanek consciously failed to halt or correct this practice, directly leading to Mr. Ross's unsafe transfer to OSP and his subsequent violent death.

80.    Defendants Harpe, Quick, Battles and Harvanek each exhibited deliberate indifference by knowingly failing to adequately train, supervise, and control their subordinate personnel, thereby creating or perpetuating unconstitutional practices, customs, and conditions.

81.    The supervisory Defendants' intentional or reckless failure to correct known constitutional violations and dangerous customs within ODOC facilities demonstrates supervisory liability under 42 U.S.C. § 1983, constituting a direct and affirmative link between their supervisory inactions and Mr. Ross's death.

82.    As a direct and proximate result of the supervisory Defendants' deliberate indifference, failure to supervise, and failure to correct systemic violations, Mr. Ross suffered severe physical harm, emotional trauma, and ultimately death.

**Third Cause of Action: *Canton* Liability Under 42 U.S.C. § 1983 (Failure to Train) Against Defendants in Their Individual Capacities**

83.    Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

84.    This claim is asserted solely against the above-named defendants in their individual capacities.

85.    Pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and *City of Canton v. Harris*, 489 U.S. 378 (1989), a government agency and its supervisory officials, when sued in their individual capacities, may be held liable for constitutional violations caused by policies, customs, or practices, including failures to train employees, where such failures demonstrate deliberate indifference to the constitutional rights of individuals. In this case, Plaintiffs seek to hold the individually named supervisory defendants liable in their personal capacities,

- 13 -

86.    Defendants Harpe, Quick, Battles and Harvanek, as well as the John and Jane Doe

Defendants, each in their roles as supervisors but sued here solely in their individual capacities,

knowingly failed to provide adequate and constitutionally required training and supervision to

ODOC staff, resulting in systemic deficiencies which proximately caused the injuries and death

of Marquiel Ross.

87.    These Defendants were aware, or reasonably should have been aware, of significant

deficiencies and prior incidents of constitutional harm resulting from their training inadequacies,

including previous inmate assaults, retaliatory transfers, improper housing assignments, failures

in security checks, crime scene preservation errors, and improper family notification protocols.

Despite such knowledge, Defendants intentionally or recklessly failed to correct or enhance the

training provided.

88.    Specific training failures constituting deliberate indifference include:

(a)    Failure to adequately train ODOC staff on the proper classification, housing, and transfer
procedures of vulnerable, nonviolent inmates, directly causing the dangerous placement of Mr.
Ross with violent inmate Justin Harris;

(b)    Failure to train staff on appropriate responses to inmates' credible reports of threats,
violence, or requests for protection, resulting in staff's deliberate disregard of Mr. Ross's safety
requests;

(c)    Inadequate training regarding adherence to established safety, monitoring, and security
check protocols, directly contributing to the failure to timely discover and respond to Mr. Ross's
violent assault and death;

(d)    Lack of sufficient training on critical constitutional obligations for crime-scene
preservation following inmate deaths, causing ODOC staff to negligently disturb and
compromise the integrity of the scene of Mr. Ross's murder;

(e)    Failure to train ODOC staff in proper and timely procedures for next-of-kin notification
and accurate death reporting, resulting in false reports and a prolonged delay in informing Mr.
Ross's family of his death;

(f)    Failure to provide training on accurate inmate release-date documentation and procedures,
directly causing Mr. Ross's prolonged detention without due process of law.

89.    The need for proper training on these specific subjects was patently obvious given prior documented patterns of similar constitutional violations and incidents of inmate harm within ODOC facilities. Thus, Defendants' deliberate indifference to these training obligations constitutes actionable *Canton* liability.

90.    As a direct and foreseeable consequence of Defendants' failure to train, Ross was subjected to unconstitutional conditions, including physical harm, prolonged detention and ultimately death. His family also suffered severe emotional distress, confusion, and prolonged grief due to ODOC's mishandling of notification and information regarding Mr. Ross's death.

91.    Plaintiffs seek compensatory damages for the injuries sustained by Mr. Ross and his family as a result of Defendants' deliberate and reckless failures to train, as well as punitive damages to deter future Constitutional violations.

**Fourth Cause of Action: Violation of Due Process Rights**
**(Under the Fourteenth Amendment – Unlawful Prolonged Incarceration)**
**Against Defendants in Their Individual Capacities**

92.    Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

93.    This claim is asserted solely against the above-named defendants in their individual capacities.

94.    Defendants Harpe, Quick, Harvanek, and other ODOC administrative and correctional staff (including the John and Jane Doe Defendants), acting under color of state law, unlawfully held Marquiel Ross in custody well beyond his lawful release dates of November 19, 2023 and July 8, 2024, each as expressly publisshed by ODOC in its offender look-up system, without justification or due process, directly violating his Fourteenth Amendment rights.

95.    Specifically, Defendants intentionally or recklessly falsified, manipulated, or failed to correct ODOC records concerning Ross's release date. Despite multiple inquiries from Ross's family members, ODOC personnel, under the supervision and authority of Defendants Harpe,

Quick, Battles and Harvanek, provided misleading, evasive, and contradictory justifications for Ross's continued detention.

96. Defendants deliberately failed to provide Mr. Ross with meaningful procedural protections or an opportunity to challenge or correct his extended detention, despite explicit constitutional requirements under clearly established law, including *Zinermon v. Burch*, 494 U.S. 113 (1990), which mandates procedural due process protections before curtailing liberty.

97. Defendant Harpe (Director of ODOC) had direct knowledge or constructive notice, through audits, internal reports, and family communications, that inmates, including Ross, were being unlawfully detained beyond their lawful discharge dates. Yet, Harpe intentionally failed to implement remedial measures to rectify systemic deficiencies in record-keeping and inmate discharge processes.

98. Defendants Quick (Warden of OSP) and Battles (Deputy Warden of OSP) knew or should have known, through their supervisory roles and routine inmate-record reviews, that Ross was being wrongfully held well past his expressly stated discharge dates. Nevertheless, they failed to intervene or correct records under their direct oversight, resulting in Mr. Ross's prolonged and unlawful incarceration.

99. Defendant Harvanek (Warden at HMCC) at the time Mr. Ross was incarcerated there, directly facilitated or failed to prevent the improper administrative handling of Ross's release records, contributing to his unjustifiable extended detention.

100. The actions and omissions of these Defendants constitute deliberate and reckless disregard for Mr. Ross's due process rights, directly resulting in his continued unlawful incarceration in an environment known for violent inmate assaults.

101. As a direct consequence of Defendants' Constitutional violations, Mr. Ross was wrongfully incarcerated nearly a year beyond his lawful release date, unlawfully exposing him to the dangers inherent to maximum-security incarceration, including his violent death.

102.  The deliberate and unlawful extension of Mr. Ross's incarceration caused severe physical, psychological, and emotional harm to Mr. Ross, culminating in his tragic death, and inflicted profound emotional distress, grief, and loss of companionship upon his family. All damages sought herein are against the individual defendants personally, and not against the State of Oklahoma or any state agency.

103.  Plaintiffs seek compensatory damages for the constitutional injuries sustained by Mr. Ross and his family as a result of Defendants' violations of his due process rights, as well as punitive damages to prevent and deter future similar constitutional violations.

**Fifth Cause of Action: Cruel and Unusual Punishment (42 U.S.C. § 1983 and the 8th and 14th Amendments to the U.S. Constitution) Against Defendants in Their Individual Capacities**

104.  Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

105.  This claim is asserted solely against the above-named defendants in their individual capacities.

106.  Defendants Harpe (Director of ODOC), Quick (Warden of OSP), Battles (Deputy Warden of OSP), Defendant Harvanek (Warden of HMCC), and other named and unnamed ODOC staff, acting under color of state law, violated Mr. Ross's Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to substantive due process by intentionally, recklessly, or with deliberate indifference failing to protect him from known risks of severe harm during his incarceration.

107.  Specifically, Defendants knowingly failed to ensure adequate inmate classification, deliberately placing Mr. Ross, a physically small, nonviolent offender with no violent criminal history, into a cell and unit populated by violent offenders, including Justin Harris, an inmate with a documented history of extreme violence toward cellmates and other prisoners.

108.  Defendants Harpe, Quick, Battles and Harvanek, as well as the John and Jane Doe Defendants, knew, through internal reports, past violent incidents, staff communications, inmate grievances, and administrative reviews, of the ongoing risk of violence posed by their inadequate inmate-classification systems, staffing shortages, and retaliatory inmate placements. Despite this knowledge, Defendants failed to correct these dangerous practices, consciously allowing vulnerable inmates like Mr. Ross to be exposed to predictable and preventable harm.

109.  Defendants Quick and her subordinate staff at OSP intentionally ignored or recklessly disregarded Ross's explicit and credible requests for protection, including complaints about imminent threats to his safety from violent inmates, demonstrating clear deliberate indifference.

110.  Defendant Harvanek and other relevant HMCC staff intentionally or recklessly retaliated against Mr. Ross for lodging complaints by transferring him from a minimum-security facility to the dangerous environment at OSP, thereby deliberately exposing him to a significant risk of serious injury or death.

111.  Defendants knowingly or recklessly disregarded established safety protocols, including routine and mandatory security checks, and failed to adequately monitor inmate safety and welfare, directly allowing conditions that culminated in Mr. Ross's assault and murder.

112.  Each Defendant's deliberate indifference in exposing Mr. Ross to known and unreasonable dangers resulted in severe physical suffering, emotional trauma, and ultimately his violent death.

113.  Plaintiffs have sustained profound emotional distress, loss of companionship, and grief as a direct result of Defendants' deliberate indifference to Mr. Ross's constitutional right to protection from cruel and unusual punishment.

114.  Plaintiffs seek compensatory and punitive damages from Defendants in their individual capacities to redress these egregious violations of Mr. Ross's constitutional rights and to prevent similar future constitutional deprivations.

115.  No monetary relief is sought from the State of Oklahoma or any state agency in connection with this claim.

### Sixth Cause of Action: Negligence Under Oklahoma State Law
### Against All Individually Named Defendants

116.  Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

117.  This claim is asserted solely against the individually named defendants in their personal capacities. No monetary relief is sought from the State of Oklahoma, the Oklahoma Department of Corrections, or any defendant in his or her official capacity.

118.  Defendants owed Mr. Ross a duty of care to:

(a)    Protect him from foreseeable harm;
(b)    Ensure safe housing assignments;
(c)    Supervise inmates effectively;
(d)    Train staff to recognize and mitigate risks.

119.  Defendants breached this duty through:

(a)    Housing Mr. Ross with a known violent offender;
(b)    Ignoring signs of danger;
(c)    Failing to intervene to prevent the fatal attack.

120.  Defendants' actions and omissions fell below the standard of care expected under the circumstances, constituting negligence under Oklahoma state law.

121.  As a direct and proximate result of Defendants' negligence, Mr. Ross suffered injuries culminating in his death, causing significant emotional and financial harm to his estate.

### Seventh Cause of Action: Wrongful Death Under 12 O.S. § 1053
### Against All Individually Named Defendants

122.  Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

123.  This claim is asserted solely against the individually named defendants in their personal

capacities. No monetary relief is sought from the State of Oklahoma, the Oklahoma Department

of Corrections, or any defendant in his or her official capacity.

124.  Under 12 O.S. § 1053, Plaintiffs bring this wrongful death action against Defendants for

their negligent, reckless, and deliberate actions leading to Mr. Ross's death.

125.  Defendants' acts and omissions, including but not limited to the failure to protect Mr. Ross,

inadequate supervision, and disregard for established protocols, created conditions that directly

and proximately caused Mr. Ross's death.

126.  The Estate of Marquiel D. Ross seeks recovery of all reasonable medical and burial

expenses incurred as a direct result of his death. This claim is brought under 12 O.S. §

1053(B)(1).

127.  Mr. Ross endured severe physical pain and mental anguish during the attack that led to his

death, as well as the emotional trauma resulting from Defendants' deliberate indifference.

Pursuant to 12 O.S. § 1053(B)(3), these damages are distributable to the surviving next of kin,

including Danielle Ross, in the same proportion as personal property of the decedent.

128.  The Estate seeks compensation for the pecuniary losses suffered by Mr. Ross's next of kin,

including his mother, Danielle Ross. These damages account for the economic value of Mr.

Ross's anticipated future earnings and contributions, based on evidence such as his age,

occupation, earning capacity, health habits, and probable life expectancy, as specified under 12

O.S. § 1053(B)(4).

129.  Danielle Ross is entitled to recover damages for the grief and loss of companionship she

has endured due to the untimely death of her son. These damages, recoverable under 12 O.S. §

1053(B)(5), reflect the emotional bond, love, and support lost as a result of his wrongful death.

130.  Oklahoma law authorizes punitive or exemplary damages in proper cases of egregious and

malicious misconduct under 23 O.S. § 9.1. Defendants' deliberate indifference, reckless

disregard for Mr. Ross's safety, and attempts to conceal their actions justify punitive damages to punish Defendants and deter similar conduct in the future. If awarded, these damages will be distributed to the surviving next of kin in the same proportion as personal property of the decedent, per 12 O.S. § 1053(C).

131.  Pursuant to 12 O.S. § 1053(D), the Court will determine the proper distribution of damages based on the pecuniary loss or loss of companionship suffered by the beneficiaries. All such distributions will occur after the payment of legal expenses and costs incurred in this action, as provided under 12 O.S. § 1053(E).

**Eighth Cause of Action: Intentional Infliction of Emotional Distress ("IIED")**
**Against All Individually Named Defendants**

132.  Plaintiff Danielle Ross re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

133.  This claim is asserted solely against the individually named defendants in their personal capacities. No monetary relief is sought from the State of Oklahoma, the Oklahoma Department of Corrections, or any defendant in his or her official capacity.

134.  Defendants Harpe, Quick, Battles and John & Jane Does 1-10 (collectively "Defendants"), acting under color of state law, engaged in extreme and outrageous conduct by:

(a)    Not notifying Danielle Ross of her son Marquiel Ross's death until a week after his passing, in clear violation of ODOC's policies requiring immediate notification of next of kin.
(b)    Providing misleading and conflicting information regarding Mr. Ross's death, including altering his discharge date multiple times.
(c)    Attempting to cremate Mr. Ross's body without proper consent, despite the family's clear objections and rights under the law.

135.  The Defendants' actions were intentional or, at minimum, recklessly indifferent to the foreseeable harm and emotional distress their conduct would cause Danielle Ross.

136.  This extreme and outrageous conduct is beyond the bounds of decency in a civilized society and is intolerable in any community.

137.  As a direct and proximate result of Defendants' intentional conduct, Danielle Ross has

suffered severe emotional distress, including but not limited to grief, trauma, anxiety, and mental

anguish, requiring ongoing emotional support and care.

138.  Plaintiff seeks compensatory and punitive damages against all Defendants in their

individual capacities.

### Ninth Cause of Action: Negligent Infliction of Emotional Distress ("NIED")
### Against All Individually Named Defendants

139.  Plaintiff Danielle Ross re-alleges and incorporates by reference all preceding paragraphs as

if fully set forth herein.

140.  This claim is asserted solely against the individually named defendants in their personal

capacities. No monetary relief is sought from the State of Oklahoma, the Oklahoma Department

of Corrections, or any defendant in his or her official capacity.

141.  Defendants owed Danielle Ross a duty of care to act reasonably in their interactions with

her following the death of her son, including:

(a)    Promptly informing her of her son's death in accordance with ODOC policy.
(b)    Providing accurate and truthful information about the circumstances surrounding Mr.
Ross's death.
(c)    Respecting her rights as next of kin to make decisions regarding her son's remains.

142.  Defendants breached this duty through their negligent and reckless actions, including but

not limited to:

(a)    Failing to notify Danielle Ross of her son's death for over a week.
(b)    Providing conflicting and misleading information about the timing and circumstances of Mr.
Ross's death.
(c)    Altering Mr. Ross's discharge date to obfuscate their accountability.
(d)    Attempting to cremate Mr. Ross's body without her consent.

143.  Defendants' negligence directly and proximately caused Danielle Ross to suffer severe

emotional distress, including but not limited to shock, anxiety, mental anguish, and feelings of

helplessness, as well as harm to her ability to grieve and find closure.

144.  Plaintiffs seek compensatory damages for the severe emotional harm they have endured

and continue to endure as a result of Defendants' actions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their

favor and against all Defendants, jointly and severally, and grant the following relief:

1. Compensatory Damages for the Estate of Marquiel D. Ross:

  (a) Recovery of all medical and burial expenses incurred as a direct result of Mr. Ross's
      death, pursuant to 12 O.S. § 1053(B)(1).
  (b) Compensation for pre-death physical pain and mental anguish suffered by Mr. Ross as a
      result of Defendants' actions, pursuant to 12 O.S. § 1053(B)(3).
  (c) Damages for the loss of Mr. Ross's future earnings and financial contributions, calculated
      based on his age, occupation, earning capacity, and probable life expectancy, as provided
      under 12 O.S. § 1053(B)(4).

2. Compensatory Damages for Danielle Ross:

  (a) Damages for grief and loss of companionship due to the wrongful death of her son, as
      provided under 12 O.S. § 1053(B)(5).
  (b) Damages for emotional distress caused by Defendants' extreme and outrageous conduct,
      including their delay in notifying her of her son's death, their misleading information, and
      their attempt to cremate his body without her consent, under IIED and NIED claims.

3.   Award punitive or exemplary damages under 23 O.S. § 9.1 and applicable federal standards

against the individual defendants for deliberate indifference, reckless misconduct, and attempts

to conceal their wrongdoing, and to punish such conduct and deter similar conduct in the future.

4.   Monetary damages under Oklahoma law, including but not limited to negligence, wrongful

death, IIED, and NIED, against the individual defendants personally.

5.   Award reasonable attorneys' fees, costs, and litigation expenses under 42 U.S.C. § 1988 and

any other applicable state and federal laws.

6.   Award pre- and post-judgment interest on all monetary damages awarded to Plaintiffs.

7.   Grant such other and further relief as the Court deems just and proper to ensure full and fair

compensation for Plaintiffs and to hold the individual defendants accountable.

Dated: September 12, 2025.    Respectfully submitted,

Richard C. Labarthe, OBA # 11393

Alexey V. Tarasov, OBA # 32926
LABARTHE & TARASOV, a professional association
1000 W. Wilshire Blvd., Suite 355
Oklahoma City, Oklahoma 73116
(405) 760-3323; (405) 843-9685 Facsimile
richard@labarthelaw.com
330 W. Gray Street, Suite 208
Norman, OK 73069
(405) 410-5631; (832) 558-3540 Facsimile
alexey@tarasovlaw.com
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing. I further certify that a true and correct copy of the foregoing document was electronically sent to all counsel of record, including:

Lauren Ray, OBA# 22694
Lexie P. Norwood, OBA# 31414
Assistant Attorneys General
Oklahoma Attorney General's Office
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921; Fax: (405) 521-4518
lauren.ray@oag.ok.gov
lexie.norwood@oag.ok.gov
**Attorneys for Defendants**

/s/ Richard C. Labarthe